**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-2132**

———————

KRYSTLE PERRY, individually and on behalf of their minor child K.P.;
ANTHONY PERRY, individually and on behalf of their minor child K.P.,

　　　　Plaintiffs – Appellees,

v.

STACY MARTENEY, in her official capacity as the Virtual Learning Coordinator
of the Upshur County Virtual School; CHRISTINE MILLER, in her official capacity
as Superintendent of the Upshur County School District,

　　　　Defendants – Appellants,

and

THE BOARD OF EDUCATION OF THE COUNTY OF UPSHUR; DR.
MATTHEW CHRISTIANSEN, in his official capacities as the State Health Officer
and Commissioner of the Bureau of Public Health; DOUG CIPOLETTI, in his
official capacity as Executive Director of the West Virginia Virtual School
Academy; BRYAN HOYLMAN, in his official capacity as Chair of the Board of
Directors of Mountain State Learning Solutions, Inc. d/b/a West Virginia Virtual
Academy,

　　　　Defendants.

———————

Appeal from the United States District Court for the Northern District of West Virginia, at
Elkins.  Thomas S. Kleeh, Chief District Judge.  (2:24−cv−00018−TSK)

———————

Argued:  January 27, 2026　　　　　　　　　　　　　　Decided:  April 8, 2026

———————

Before WILKINSON, NIEMEYER, and AGEE, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee joined. Judge Niemeyer wrote a dissenting opinion.

_____

**ARGUED:** William M. Lorensen, BOWLES RICE, LLP, Charleston, West Virginia, for Appellants.  Christopher David Wiest, CHRIS WIEST, ATTORNEY AT LAW, PLLC, Covington, Kentucky, for Appellees.  **ON BRIEF:** Robert J. Kent, Ryan S. Moore, Leigh Anne Wilson, BOWLES RICE, LLP, Parkersburg, West Virginia, for Appellants.  Aaron Siri, Elizabeth A. Brehm, Walker Moller, SIRI & GLIMSTAD LLP, New York, New York, for Appellees.

_____

WILKINSON, Circuit Judge:

Anthony and Krystle Perry brought this suit on behalf of their daughter to obtain a religious exemption from West Virginia's compulsory vaccination law. Religious exemptions are not available under state law, but the Perrys claim they are required by the First Amendment. After finding that the Perrys were likely to succeed on the merits of their free exercise claim, the district court granted them a preliminary injunction. We now reverse the district court's decision to grant preliminary relief.

Rights, as important as they are, do not swing free and clear of the larger social compact. We live in a society that accords its citizens enormous benefits. In return, states can, in a measured way, require certain exactions and accommodations to the broader social interest. The police power of the states "embrace[s], at least, such reasonable regulations . . . as will protect the public health and the public safety." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). West Virginia's compulsory vaccination law does exactly that. It is a legitimate exercise of the state's power to protect the health and well-being of school children. Striking the law down would undermine not just our system of dual sovereignty, but also a long line of Supreme Court precedent.

I.

A.

West Virginia requires children attending schools in the state to be vaccinated against a host of infectious diseases, including chickenpox, hepatitis B, measles, meningitis, mumps, diphtheria, polio, rubella, tetanus, and whooping cough. W. Va. Code § 16-3-4(c). Similar compulsory vaccination laws exist in all fifty states. West Virginia is

3

an outlier, however, in its refusal to grant exemptions to children whose sincerely held religious beliefs prevent them from getting vaccinated. J.A. 42.

The only permissible basis for receiving an exemption is if a child's "physical condition . . . is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. Va. Code § 16-3-4(h)(1). A contraindication is "a medical condition which renders an immunization improper for a particular individual." W. Va. Code R. § 64-95-2.4. The CDC's Advisory Committee on Immunization Practices publishes contraindications for each vaccine. *Id.* A precaution is "a condition defined under the current standards of immunization practice that might increase the chance or severity of an adverse vaccine reaction or compromise the ability of the vaccine to produce immunity." *Id.* § 64-95-2.10.

To request a medical exemption, a child must obtain the certification of a licensed physician. W. Va. Code § 16-3-4(h)(1). West Virginia's Immunization Officer then decides whether there is sufficient medical evidence to justify an exemption. *Id.* § 16-3-4(h)(2). The Immunization Officer's decision can be appealed to the State Health Officer who makes the final determination. *Id.* § 16-3-4(h)(4)–(5). If a child is unsatisfied with the outcome of the administrative process, she has a right to judicial review under West Virginia's Administrative Procedures Act. *Id.* §§ 16-3-4(h)(5), 29A-5-4(a).

B.

Anthony and Krystle Perry enrolled their daughter K.P. in the Virtual Academy, a public school that provides online education to children in West Virginia. After K.P. had been enrolled in the school for 16 months, the Virtual Learning Coordinator contacted

4

Mrs. Perry regarding K.P.'s vaccination status. When Mrs. Perry confirmed that her daughter was not fully vaccinated, K.P. was disenrolled from the school. Mrs. Perry later sought a religious exemption from the vaccine requirement, but the Virtual Learning Coordinator informed her that religious exemptions were not available.

Mr. and Mrs. Perry then brought this suit on behalf of themselves and K.P. They claimed that West Virginia's compulsory vaccination law violated their First Amendment right to freely exercise their Christian faith. The Perrys also sought a preliminary injunction that would permit K.P. to re-enroll in the Virtual Academy while the litigation progressed.

The district court found that the Perrys were likely to succeed on the merits of their free exercise claim. Applying the framework laid out in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the court concluded that West Virginia's compulsory vaccination law was neither generally applicable nor narrowly tailored to serve a compelling state interest. After finding the other preliminary injunction factors satisfied, the court granted preliminary relief to the Perrys. This appeal followed.

## II.

We review a district court's decision to grant a preliminary injunction for abuse of discretion. *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102 (4th Cir. 2022). However, any legal conclusions involved in reaching that decision are reviewed de novo. *Id.* The only issue on appeal is whether the district court erred when it concluded that the Perrys were likely to succeed on the merits of their claim. Because West Virginia's compulsory vaccination law is in all likelihood constitutional, we hold that it did.

5

A.

1.

The First Amendment guarantees that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. Following passage of the Fourteenth Amendment, the states became equally incapable of enacting such laws. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). "But neither the [fourteenth] amendment . . . nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people." *Barbier v. Connolly*, 113 U.S. 27, 31 (1884). At the very core of the states' police power is the authority to "protect the public health and the public safety" by "enact[ing] quarantine laws and 'health laws of every description.'" *Jacobson*, 197 U.S. at 25.

One common health measure is vaccination, and its history stretches back to our nation's founding. During the Revolutionary War, General George Washington ordered the mandatory inoculation of the Continental Army against smallpox, declaring that "[n]ecessity not only authorizes but seems to require the measure, for should the disorder infect the Army . . . we should have more to dread from it than from the Sword of the Enemy." Letter from George Washington to William Shippen, Jr. (Feb. 6, 1777), *in* 8 THE PAPERS OF GEORGE WASHINGTON, REVOLUTIONARY WAR SERIES, JANUARY 1777 – MARCH 1777, at 264 (Frank E. Grizzard, Jr. ed. 1998). Decades later in 1810, Massachusetts passed one of the first laws in the nation promoting vaccination. An Act to Diffuse the Benefits of Inoculation for the Cow Pox, ch. CXVI, 1810 Mass. Acts 204, 204.

6

And in 1855, Massachusetts became one of the first states to require children to get vaccinated as a condition of entering public school. An Act to Secure General Vaccination, ch. 414, 1855 Mass. Acts 812, 812.

The Supreme Court first considered the constitutionality of compulsory vaccination laws fifty years later in *Jacobson*. There, it affirmed the conviction of a defendant for refusing to get vaccinated against smallpox after finding that the law did not "invade[] any right secured by the Federal Constitution." *Jacobson*, 197 U.S. at 38. The Court explained that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. "The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the [state] essential to the safety, health, peace, good order, and morals of the community." *Id.* at 26 (quoting *Crowley v. Christensen*, 137 U.S. 86, 89 (1890)). If "the rule [were instead] that each [man] is a law unto himself," then society "would soon be confronted with disorder and anarchy." *Id.*

The Supreme Court reaffirmed its decision in *Zucht v. King*, 260 U.S. 174 (1922), where it held that a law requiring school children to be vaccinated did not violate the due process and equal protection clauses of the Fourteenth Amendment. *Id.* at 176–77. According to the Court, *Jacobson* had already "settled that it is within the police power of a state to provide for compulsory vaccination." *Id.* at 176. Indeed, *Jacobson* favorably discussed several state laws requiring "the vaccination of children [as] a condition of their right to enter or remain in public schools." 197 U.S. at 31–33.

Two decades later, in *Prince v. Massachusetts*, 321 U.S. 158 (1944), the Supreme Court clarified that a state's authority to protect a child's health and well-being "is not

7

nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience." *Id.* at 166. Citing *Jacobson*, the Court explained that a parent "cannot claim freedom from compulsory vaccination for [his] child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or [one's] child to communicable disease or the latter to ill health or death." *Id.* at 166–67 & n.12.

That brings us to the Supreme Court's decision in *Smith*. There the Court was asked to hold that an individual's right of free exercise is violated whenever a generally applicable law requires him to perform an act that his religious beliefs forbid. 494 U.S. at 878. It declined to do so. Echoing the concerns it expressed in *Jacobson*, the Court reasoned that such a rule would "permit every citizen to become a law unto himself" by making "religious belief superior to the law of the land." *Id.* at 879 (quoting *Reynolds v. United States*, 98 U.S. 145, 167 (1878)). It thus held that "the right of free exercise does not relieve an individual of the obligation to comply with" neutral and generally applicable laws. *Id.*

The *Smith* Court also refused to apply any form of heightened scrutiny to such laws. It warned that doing so "would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind," including "compulsory vaccination laws." *Id.* at 888–89. The Court then favorably cited the Supreme Court of Arkansas's decision in *Cude v. State*, 377 S.W.2d 816 (Ark. 1964), which held that "it is within the police power of the State to require that school children be vaccinated against smallpox, and that such requirement does not violate the constitutional rights of

8

anyone, on religious grounds or otherwise." *Id.* at 819. Indeed, the principle was "so firmly settled that no extensive discussion [was] required." *Id.*

After *Smith*, then, courts will only scrutinize neutral and generally applicable laws for a rational basis. *Polk v. Montgomery Cnty. Pub. Schs.*, 166 F.4th 400, 413 (4th Cir. 2026). A law can withstand rational basis scrutiny so long as it is "rationally related to a legitimate governmental interest." *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 561 (4th Cir. 2013) (quoting *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006)).

2.

This unbroken line of decisions resolves the case before us.

West Virginia legitimately exercised its police power to protect the health and well-being of school children when it enacted its compulsory vaccination law. *See* W. Va. Code § 16-3-5 ("Immunization of children at an early age . . . is essential to maintain our children's health and well-being."). Because the law is neutral and generally applicable, the Perrys' free exercise rights do not relieve them of their obligation to comply with it. *Accord Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353–54 (4th Cir. 2011) ("[F]ollowing the reasoning of *Jacobson* and *Prince*, we conclude that the West Virginia statute requiring vaccinations as a condition of admission to school does not unconstitutionally infringe [plaintiff]'s right to free exercise.").

West Virginia has a legitimate—indeed, compelling—interest in reducing the spread and severity of infectious diseases. *See id.* at 353 ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."). The diseases

9

covered by the law are serious and can lead to debilitating, life-threatening complications: diphtheria (myocarditis, kidney failure, nerve damage, death); polio (permanent paralysis, meningitis, death); measles (pneumonia, respiratory tract damage, brain swelling, death); mumps (brain swelling, meningitis, death); rubella (hemorrhagic issues, brain swelling, birth defects, death); whooping cough (pneumonia, brain swelling, seizures, death); tetanus (spasms, nerve dysfunction, death); chickenpox (bacterial infections, brain swelling, lung inflammation, death); and hepatitis B (cirrhosis, liver cancer, death). 2 GERALD MANDELL ET AL., PRINCIPLES AND PRACTICE OF INFECTIOUS DISEASES 1964–66, 2069–72, 2128–29, 2202–04, 2231–33, 2346–48, 2690–91, 2958, 3092–93 (7th ed. 2010).

Vaccines are not just rationally related to reducing the spread and severity of infectious diseases, they are specifically designed to do so. Smallpox went from killing 10% of London's population in the 17th century and 500 million people globally between 1880 and 1980 to *completely* eradicated by 1980 after a global vaccination campaign. D.A. HENDERSON, SMALLPOX: THE DEATH OF A DISEASE 11–12, 39 (2009). Deaths caused by the diseases covered by West Virginia's law have also been significantly reduced since vaccines were first developed: diphtheria (100%); polio (100%); measles (100%); mumps (100%); rubella (100%); whooping cough (99.3%); tetanus (99.2%); chickenpox (81.9%); and hepatitis B (80.2%). Sandra W. Roush & Trudy V. Murphy, *Historical Comparisons of Morbidity and Mortality for Vaccine-Preventable Diseases in the United States*, 298 JAMA 2155, 2156 tbl.1, 2158 tbl.2 (2007).

For these reasons, a state's interest in vaccinating its citizens and protecting its school children has long been recognized as of the utmost importance. *See, e.g.*, *Jacobson*,

10

197 U.S. at 25–27. This is not just some ho-hum, every day "compelling interest." Even under the strictest scrutiny, courts should not annul and eviscerate this fundamental state concern merely because a challenged law in some respect falls short of some perceived perfection. And much less is required of neutral and generally applicable laws. *See City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) ("*Smith* held that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.").

Remember too that the plaintiffs' rights are not the only things at issue here. Parents and grandparents have their own interest in not seeing their children and grandchildren in school environments with significant numbers of unvaccinated peers. The fact that the executive branch of the federal government may be evincing skepticism to vaccinations does not require the enlistment of the judicial branch in an assault upon state vaccination requirements. It is possible we take the benefits of vaccination so much for granted that we regard too casually the opening of a second front. States remain free to recognize the weighty medical evidence supporting the value of vaccinations in safeguarding public health. Such determinations lie at the very heart of the states' police power. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1836 (2025) ("We afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007))).

Our friend in dissent chides us for approaching the issue "mostly from 10,000 feet above" and lauds his own attention to the particulars. Diss. Op. at 30. Of course the particulars are important but that hardly justifies lodging all responsibility for their

11

examination in the courts. Quite missing from the dissent is any appreciation that legislatures can craft *particular* compromises. It is what they do. Also missing is any recognition that the accumulation of particulars will assuredly in time eviscerate general and fundamental principles. This danger is nowhere so underestimated as at its inception.

B.

The district court erred in reaching the opposite legal conclusion. In its view, West Virginia's compulsory vaccination law is not generally applicable because the process for granting medical exemptions involves "significant individualized discretion." J.A. 586. We cannot agree. Determining whether a child qualifies for a medical exemption may require some degree of professional judgment, but that is not the kind of unfettered discretion that undermines the general applicability of a law.

In *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the Supreme Court explained that "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Id.* at 1877 (quoting *Smith*, 494 U.S. at 884). As an example of one such mechanism, the Court pointed to its decision in *Sherbert v. Verner*, 374 U.S. 398 (1963). *Sherbert* concerned a provision in South Carolina's Unemployment Compensation Act that deemed claimants ineligible for unemployment benefits if they refused to accept work "*without good cause*." *Id.* at 400–01 (emphasis added). The *Fulton* Court explained that the "good cause" standard operated as a mechanism for granting individualized exemptions because it "permitted the government to grant exemptions based on the circumstances underlying each application." 141 S. Ct. at 1877.

12

The facts in *Fulton* provide another example. That case concerned a provision in Philadelphia's standard foster care contract that prohibited discrimination on the basis of sexual orientation "unless an exception is granted by the Commissioner . . . in his/her *sole discretion*." *Id.* at 1878 (emphasis added). The Supreme Court found that the city's antidiscrimination policy created "a formal system of entirely discretionary exceptions" by inviting the Commissioner "to decide which reasons for not complying with the policy [were] worthy of solicitude." *Id.* at 1878–79.

Unlike the "good cause" standard in *Sherbert* and the "sole discretion" standard in *Fulton*, West Virginia's compulsory vaccination law does not provide a mechanism for granting individualized exemptions. State officials do not have any discretion "to decide which reasons" for refusing vaccination "are worthy of solicitude." *Id.* at 1879. The law recognizes only one kind of exemption—medical exemptions—and clearly articulates the circumstances in which state officials can grant them: when there is "sufficient medical evidence" that a child's "physical condition . . . is such that immunization is contraindicated or there exists a specific precaution to a particular vaccine." W. Va. Code § 16-3-4(h). To the extent state officials must exercise discretion when deciding whether sufficient medical evidence exists in a particular case, it is cabined by judicial review. *Id.* §§ 16-3-4(h)(5), 29A-5-4(a), (g).

We do agree with the district court that West Virginia's process for granting medical exemptions "involves discretion and judgment." J.A. 587. Determining whether an individual qualifies for an exemption will often require some individualized assessment. But as the Tenth Circuit has explained, "that kind of limited yes-or-no inquiry is

13

qualitatively different from the kind of case-by-case system envisioned by the *Smith* Court in its discussion of *Sherbert* and related cases." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004). If it were otherwise, then there would be no limiting principle. Every legal standard or criterion that required some degree of professional judgment in its application would suddenly run afoul of the Free Exercise Clause. This cannot be.

Indeed, as far as we are aware, every circuit court that has considered the issue has held that medical exemptions to compulsory vaccination laws are not "mechanisms for individualized exemptions" within the meaning of *Fulton*. *See Does 1-6 v. Mills*, 16 F.4th 20, 30 (1st Cir. 2021); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288–89 (2d Cir. 2021); *Spivack v. City of Philadelphia*, 109 F.4th 158, 173 (3rd Cir. 2024); *Doe v. S.D. Unified Sch. Dist.*, 19 F.4th 1173, 1180 (9th Cir. 2021).

The Perrys claim that two decisions are to the contrary. Resp. Br. at 20–21 (citing *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 733–34 (6th Cir. 2021); *Does 1-11 v. Bd. of Regents of the Univ. of Colo.*, 100 F.4th 1251, 1273 (10th Cir. 2024)). But neither decision is on point. In both cases, the court held only that a compulsory vaccination policy lacked general applicability because it permitted university officials to grant religious exemptions on an individualized basis. *Dahl*, 15 F.4th at 733–34; *Does 1-11*, 100 F.4th at 1273. West Virginia's law does not permit religious exemptions of any kind.

C.

Finally, the Perrys ask us to affirm the district court's decision on three alternate bases. None are persuasive.

14

1.

The Perrys first argue that West Virginia's compulsory vaccination law is not generally applicable for another reason: it does not apply to other groups that pose a similar hazard to public health. While K.P. must get vaccinated to attend the Virtual Academy, the Perrys point out that the vaccine mandate does not apply to: (1) children educated outside of the school system (*i.e.*, educated at home, in learning pods, or in microschools); (2) adults working in schools; or (3) children attending school who have been granted a medical exemption.

It is certainly true that West Virginia's vaccine mandate could sweep more broadly than it does. The law could apply in other contexts, to other age groups, and to other infectious diseases. But a law does not lack general applicability merely because it makes classifications. All laws do so to one degree or another. Classifications only pose a constitutional concern if they treat "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). That is, we ask whether the law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.

The first two groups the Perrys identify—children educated outside the school system and adults working in schools—are treated more favorably than children attending the Virtual Academy. However, the Perrys do not allege that K.P.'s desire to attend the Virtual Academy is religiously motivated, so this is merely an instance of West Virginia treating some secular activity more favorably than other secular activity. That does not undermine the law's general applicability under *Fulton* and *Tandon*.

15

The only religiously motivated conduct at issue here is K.P.'s refusal to get vaccinated. The Perrys argue that medical exemptions undermine West Virginia's asserted health interests in the same way that granting religious exemptions would because every unvaccinated child is at an elevated risk of developing and transmitting infectious diseases, regardless of the reason why they remain unvaccinated.

The Second Circuit confronted a similar argument in *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (2d Cir. 2023). There, the plaintiffs argued that "[w]hen two unvaccinated children walk through the schoolhouse door, disease will not walk up to them and ask them why they are . . . unvaccinated." *Id.* at 153. Even so, the Second Circuit concluded that permitting medical exemptions while refusing religious exemptions "does, in both instances, advance the State's interest in promoting health and safety." *Id.* The court's explanation is worth quoting at length:

> The Act promotes the health and safety of *vaccinated* students by decreasing, to the greatest extent medically possible, the number of unvaccinated students (and, thus, the risk of acquiring vaccine-preventable diseases) in school. The Act also promotes the health and safety of *unvaccinated* students. Not only does the absence of a religious exemption decrease the risk that unvaccinated students will acquire a vaccine-preventable disease by lowering the number of unvaccinated peers they will encounter at school, but the medical exemption also allows the small proportion of students who cannot be vaccinated for medical reasons to avoid the harms that taking a particular vaccine would inflict on them. . . . In contrast, exempting religious objectors from vaccination would only detract from the State's interest in promoting public health by increasing the risk of transmission of vaccine-preventable diseases among vaccinated and unvaccinated students alike.

*Id.* We are in accord with the reasoning of the Second Circuit, as are several of our sister circuits. *See Doe*, 19 F.4th at 1177–78; *Spivack*, 109 F.4th at 176; *Does 1-6*, 16 F.4th at 31–32. We note that the Supreme Court vacated and remanded a similar Second Circuit

16

decision for reconsideration in light of *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). *See Miller v. McDonald*, 146 S. Ct. 879 (2025) (mem.). As we set forth below, West Virginia's compulsory vaccination law is altogether distinguishable from the policy at issue in *Mahmoud*.

West Virginia requires school children to get vaccinated because vaccination generally promotes their health and well-being. Nothing about that health decision disfavors religious beliefs. The two things simply run on separate tracks. Medical exemptions are thus categorically incomparable to conscientious exemptions of all stripes in terms of how they affect West Virginia's health interests.

Indeed, medical exemptions will often not be comparable to religious exemptions when the government's asserted interest relates to health. Medical classifications and exemptions are an inescapable part of health regulation, and they generally exist to advance the state's health interests, not to undermine them. A state that limits the scope of a health law for medical reasons is not thereby compelled to grant religious or other non-health exemptions. To hold otherwise would lead to a slow unravelling of all manner of health and safety regulation. "The First Amendment's protection of religious liberty does not require" such an interference with the states' police power. *Smith*, 494 U.S. at 889.

Consider a law that prohibits the use of certain drugs without a medical prescription. Does the allowance of medically prescribed drug use mean the state must permit religiously motivated drug use? *See id.* at 874, 878 (rejecting a free exercise challenge to one such law). Or consider a law that prohibits doctors from administering hormones or puberty blockers to minors except to treat a medically verifiable disorder of sex development.

17

Could a transgender minor get around this prohibition by claiming his desire to identify as the opposite sex is religiously inspired? *Cf. Skrmetti*, 145 S. Ct. at 1829 (rejecting an equal protection challenge to one such law).

The same proposition holds true for compulsory vaccination laws. West Virginia has significant latitude to determine when vaccines are beneficial to its residents' health and well-being. These determinations will not offend the Free Exercise Clause so long as West Virginia remains focused in all cases on health and safety.

2.

The Perrys next argue that *Smith* does not apply because this case is governed instead by the Supreme Court's decisions in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). Under *Yoder* and *Mahmoud*, a law that "substantially interfer[es] with the religious development" of a child is subject to strict scrutiny "regardless of whether the law is neutral or generally applicable." *Mahmoud*, 145 S. Ct. at 2361.

*Yoder* concerned a compulsory school attendance law that "place[d] Amish children in an environment hostile to Amish beliefs . . . during the crucial and formative adolescent period of life." 406 U.S. at 211. The law "expos[ed] Amish children to worldly influences in terms of attitudes, goals, and values contrary to beliefs, and . . . substantially interfer[ed] with the religious development of the Amish child and his integration into the way of life of the Amish faith community." *Id.* at 218. Compulsory school attendance thus "carrie[d] with it a very real threat of undermining the Amish community." *Id.*

18

*Mahmoud* concerned a school policy that would not allow parents to opt their children out of instruction involving "'LGBTQ+-inclusive' storybooks." 145 S. Ct. at 2343–46. These storybooks were "designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Id.* at 2353. Because the values and beliefs celebrated by the storybooks were "'hostile' to the[] parents' religious beliefs," the storybooks "carr[ied] with them 'a very real threat of undermining' the religious beliefs that the parents wish[ed] to instill in their children." *Id.* at 2355 (quoting *Yoder*, 406 U.S. at 211, 218).

The burden imposed by West Virginia's compulsory vaccination law is not remotely "of the same character" as those imposed in *Yoder* and *Mahmoud*. *Id.* at 2361. The law is a public health measure, not an instrument of ideological indoctrination. It does not expose children to values or beliefs that might be hostile to their parents' religious beliefs. It does not require that school instruction extoll the virtues of vaccines. All the law requires is that, in the interest of protecting others, children get themselves vaccinated before attending school. The need for some to protect the health and well-being of all was not present in *Yoder* or *Mahmoud*.[1]

The Supreme Court's decision in *Prince* is instructive on this issue. As in *Mahmoud*, the *Prince* Court recognized the right of parents to direct the religious upbringing of their children. 321 U.S. at 165–66 (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624

---

[1] The Supreme Court's recent action in *Mirabelli v. Bonta*, 146 S. Ct. 797 (2026) (per curiam), is distinguishable for similar reasons. It was a preliminary action that did not involve a public health measure. Rather, it dealt with whether schools could facilitate children's efforts to identify as the opposite gender without notifying their parents.

19

(1943); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)). However, the Court qualified that "neither rights of religion nor rights of parenthood are beyond limitation" and explained that a state's authority as parens patriae

> is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. . . . The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

*Id.* at 166–67. *Prince*, like *Jacobson* before it, is directly on point. Nothing in *Yoder* or *Mahmoud* casts doubt on the validity of these precedents, and we are bound to follow them. Regretfully, the dissenting opinion all but ignores these two decisions. We have repeatedly been told to follow Supreme Court decisions until the Court itself overrules them. *See, e.g.*, *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2038 (2023); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Apparently the temptation to jump the gun has in some quarters inadvisably proved irresistible.

### 3.

Because West Virginia's law is neutral, generally applicable, and distinguishable from the burdens imposed in *Mahmoud* and *Yoder*, it is subject to rational basis scrutiny. *Polk*, 166 F.4th at 413. The Perrys' final argument is that the law cannot even survive this highly deferential standard of review. In their view, there is no rational basis for requiring children who attend school virtually to get vaccinated because online learning yields no appreciable risk of disease transmission.

The Perrys cannot succeed under rational basis review simply by nibbling away at West Virginia's law one bite at a time. Children who attend school virtually may be at a

20

lower risk of contracting and spreading infectious diseases, but the risk still remains. To be sure, states can enact religious exemptions to vaccination requirements, or they can leave vaccination purely as a matter of personal choice. But in our federal system, states also have a legitimate interest in minimizing public health risks to the degree they deem advisable. A state can thus require significant swaths of its population to be vaccinated, so long as it reasonably believes such a step would protect and promote the public health. *See, e.g.*, *Jacobson*, 197 U.S. at 12–13, 25–27 (upholding a law that required "all the inhabitants of Cambridge" to get vaccinated). The estimation of risk is preeminently a legislative matter, resting as it does on empirical assessment and public sentiment. Courts should not rush to second-guess these legislative judgments; the judiciary should hesitate before compelling religious exemptions to a host of civic obligations. *See Smith*, 494 U.S. at 888–89.

The Perrys' real issue with the law is not that it is overbroad, but that it is underinclusive. For example, they suggest there is no rational basis for requiring children who attend school virtually to get vaccinated when children educated at home, in learning pods, and in microschools can remain unvaccinated. Under rational basis review, however, West Virginia does not need to "strike at all evils at the same time or in the same way." *Semler v. Or. State Bd. of Dental Exam'rs*, 294 U.S. 608, 610 (1935). It can "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955).

Unlike children educated at home, in learning pods, or in microschools, children who attend the Virtual Academy are part of the school system. They alone can participate

21

in school-provided extra-curricular activities and must go to school in person for periodic testing. Oral Arg. at 4:35. "The differences between the two activities may not be striking, but differentiation need not be striking in order to survive rational-basis scrutiny." *City of Dallas v. Stanglin*, 490 U.S. 19, 28 (1989). "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911)).

## III.

Is the West Virginia law at issue one we would have drafted? Maybe so, maybe not. Is the West Virgina statute constitutional? Yes.

Any difference is no mystery. Vaccines, of course, are generally aimed at prevention, antibiotics at treatment. A judicial scratch on the surface of these twin pillars of modern medicine would in time become a gash, as courts progressively chipped away at the means by which ends of undisputed public benefit are implemented. It is ever so.

Individual rights and liberties are a cherished part of American constitutionalism. Equally valued however is our constitutional structure. The dissenting opinion ignores the Constitution's architecture. Its litigious erosion of mandatory state vaccination laws does more than deprive states of their historic sovereignty. It does more than infringe on the democratic prerogative of societal self-protection. It invites the return of ancient scourges to these very modern times, and the infliction of preventable pain and personal suffering that rivals the individual right that the good plaintiffs in this case have come to assert.

22

The district court erred when it concluded that the Perrys were likely to succeed on the merits of their free exercise claim. West Virginia has significant discretion to pass legislation it believes best serves the collective good, and it did not abuse that discretion here. The state's compulsory vaccination law serves a compelling interest and evinces no hostility to religion. Accordingly, we reverse the district court's decision to grant a preliminary injunction and remand the case for proceedings duly informed by the decision herein.

*REVERSED AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

When, based on sincerely held religious beliefs, Krystle and Anthony Perry refused to fully vaccinate their young school-aged child, as required by West Virginia's mandatory vaccination law, Upshur County school officials expelled the child from its Upshur County Virtual School, a tuition-free, online, at-home schooling program that was offered in lieu of physically attending public school. Because the mandatory vaccination law did not require that homeschooled children be vaccinated, the Perrys attempted to homeschool their child, but they did so imperfectly. Krystle Perry could not devote the necessary time to the child's homeschooling because she was the bread winner in the family and her job took her out of the home, and Anthony Perry, who was totally disabled, was unable to perform all the duties of homeschooling. The Perrys thus faced potential criminal prosecution under West Virginia Code § 18-8-2 for failing to educate their child.

The Perrys commenced this action against Upshur County school officials ("School Officials") under 42 U.S.C. § 1983 and the First Amendment's Free Exercise Clause, as incorporated by the Fourteenth Amendment, seeking a religious exemption from the mandatory vaccination of their child. They pointed out that West Virginia law exempts school-aged children from vaccination who are homeschooled or who attend a "learning pod" (group homeschooling) or a "microschool" (an alternative school initiated by one or more teachers or an entity). But the law does not exempt students attending public virtual schools at home online. They also pointed out that 45 other States provide religious exemptions from vaccination, but not West Virginia. In their complaint, the Perrys sought declaratory and injunctive relief, requiring the School Officials to re-enroll their child in

24

the Upshur County Virtual School without requiring them to vaccinate her in violation of their religious beliefs.

The district court granted the Perrys a preliminary injunction prohibiting the School Officials from enforcing the mandatory vaccination law against the Perrys and their child in recognition of their religious beliefs and prohibiting the School Officials from denying the child's reenrollment in the Upshur County Virtual School based on the child's "unvaccinated status." The court concluded that the mandatory vaccination law, West Virginia Code § 16-3-4, was subject to strict scrutiny and that, with respect to *virtual* students in particular, the law was not sufficiently tailored to the State's compelling interest in preventing the spread of infectious disease in view of exceptions that the mandatory vaccination law allowed. Accordingly, it concluded that the Perrys were likely to succeed on their claim and that the other factors for entering a preliminary injunction were satisfied.

I agree with the district court. The injunction entered here hardly affects West Virginia's compelling interest in preventing the spread of infectious disease, as the injunction treats virtual students the same as other West Virginia students not physically attending a school while, at the same time, preserving the Perrys' free exercise rights. Moreover, since the district court entered the preliminary injunction in this case, the Supreme Court has issued opinions that confirm the district court's decision and, indeed, command such an injunction. *See Mahmoud v. Taylor*, 606 U.S. 522 (2025); *see also Miller v. McDonald*, 146 S. Ct. 879 (mem.) (2025); *Mirabelli v. Bonta*, 146 S. Ct. 797 (per curiam) (2026). I would affirm.

25

I

The Perrys, residents of Fayette County, West Virginia, had enrolled their young daughter in the Upshur County Virtual School, which enabled the Perrys' child, as well as other students in the school, to participate in schooling online from home, much like students receiving homeschooling. But while virtual schooling is conducted by state-certified teachers, homeschooling is provided by the students' parents. Even though the Perrys' child was not physically present in a public school classroom with other children, she enjoyed interacting with them virtually, and she excelled in learning. This structure enabled Anthony Perry, who was disabled, to "seamlessly oversee [his child's] education" from home.

In December 2023, the Superintendent of the West Virginia Department of Education sent guidance to school officials across the State, advising them that, just like students physically attending school in person, "virtual students are required to be fully immunized according to W. Va. Code 16-3-4." The Superintendent's guidance instructed School Officials to "review the enrollment records of your full-time virtual students and work with your administrators and school nurses to correct any non-compliant enrollment occurrences."

In response to that notice, Upshur County School Officials advised the Perrys that their child was missing required vaccinations and that she needed to receive all the vaccines required by § 16-3-4 in order to continue attending the Upshur County Virtual School. Krystle Perry indicated that the Perrys could not vaccinate their child, as it conflicted with their sincerely held Christian beliefs. After considering her request, School Officials

26

advised Krystle that her child nonetheless had to be vaccinated and that "if the Legislature permitted a religious exemption in the future or [the Perrys] decided to vaccinate [their child]," then the child could re-enroll in the Upshur County Virtual School.

The applicable provisions of the West Virginia Code are not in dispute. West Virginia requires that every child in the State, within specified ages, attend school. W. Va. Code § 18-8-1a. But children receiving approved home instruction are exempt from attending school, *id*. § 18-8-1(c), as are children participating in "learning pod[s]" and children attending "microschool[s]," *id*. § 18-8-1(n). "Learning pods" are voluntary associations of parents "choosing to group their children together to participate in their . . . studies as an alternative to enrolling in a . . . school." *Id*. § 18-8-1(n)(1)(A). And "microschools" are schools "initiated by one or more teachers or an entity to operate a school that charges tuition" and "is an alternative to enrolling in" a more traditional school. *Id*. § 18-8-1(n)(1)(B).

The mandatory vaccination law provides that every child *entering a public, private, or parochial school* in the State "must be immunized against [10 specified diseases]" and that no child "may be admitted or received in any of the schools of the state . . . until he or she has been immunized against [those diseases]." W. Va. Code § 16-3-4(a)–(c). The statute does not require the vaccination of children who are approved to receive instruction at home, as they do not attend school. The law also does not apply to children participating in learning pods or attending microschools. *See id*. § 18-8-1(n)(8). The mandatory vaccination law also exempts children from vaccination if the Commissioner of the Bureau of Public Health determines, based on medical evidence, that "immunization is

27

contraindicated or there exists a specific precaution to a particular vaccine." *Id*. § 16-3-4(h).

In short, all children in West Virginia physically attending schools must be vaccinated, but those receiving homeschooling, participating in learning pods, or attending microschools are exempt, as are children who are exempted by the Commissioner for medical reasons. The mandatory vaccination law contains no exemption or exception for religious reasons, nor does it exempt children enrolled in a public *virtual* school.

The Perrys formally requested a religious exemption from vaccination for their child, and when School Officials denied their request, they commenced this action against Upshur County School Officials for declaratory and injunctive relief to enforce their rights under the First Amendment's Free Exercise Clause, as incorporated against the States by the Fourteenth Amendment. The Perrys made clear in their complaint that their action was "an 'as applied' challenge" limited to their particular circumstances — as parents holding sincere religious beliefs against vaccination whose minor child was excluded from a public *virtual* school because she was not fully vaccinated.

Shortly after filing their complaint, the Perrys filed a motion for a preliminary injunction, requesting an order requiring that their child be re-enrolled in the Upshur County Virtual School while the litigation was ongoing. Following full briefing and a hearing, the district court granted the Perrys' motion with a memorandum opinion and order dated October 15, 2024.

In entering its order, the district court addressed all four factors required by *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), but it focused most

particularly on the requirement that the Perrys demonstrate a likelihood of success on the merits, concluding that they had satisfied that factor. After concluding that the West Virginia mandatory vaccination law was "not a generally applicable statute" and therefore that the law was subject to strict scrutiny, the court concluded that the statute, as applied to the Perrys, failed to satisfy strict scrutiny. While the court agreed with the School Officials that they had established "a compelling state interest in preventing the spread of infectious disease," it concluded that the School Officials had "failed to demonstrate W. Va. Code § 16-3-4 [was] narrowly tailored to achieve the identified compelling state interest."

At the outset, the court noted that "the approach West Virginia [had] taken [was] broader than" that taken by "45 other states [that] have religious or philosophical exemption options to their vaccine mandates." But more particular to its decision, the court noted that "West Virginia [had] also provided carve outs" from the compulsory vaccination law "for other students removed from physical school structures," such as children who are homeschooled or those who participate in "learning pods" or "microschools." The court observed that "[t]hese students, like virtual students, rarely, if ever, physically attend class or school" and therefore that it "strain[ed] reason to find [that] W. Va. Code § 16-3-4 [was] sufficiently [narrowly] tailored to advance the State's interest" when similarly situated students were treated differently.

In addition to finding that the Perrys were "likely to succeed in the merits" of their free exercise claim, the court also found that the Perrys had satisfied the three other *Winter* factors — that they were likely to suffer irreparable harm were they not granted immediate relief because the Perrys' child "ha[d] been denied her parents' preferred method of

29

constitutionally-required education," and they would consequently be required to face the daunting challenges of homeschooling her, "solely because [they] refused to sacrifice their religious beliefs" and that both the balance-of-the-equities and the public-interest factors were established because there was a likely First Amendment violation.

From the district court's preliminary injunction order, the School Officials filed this interlocutory appeal. *See* 28 U.S.C. § 1292(a).

## II

The majority opinion's analysis to reverse the district court's order is conducted mostly from 10,000 feet above, maintaining that neutral and generally applicable compulsory vaccination laws are constitutional, based on Supreme Court cases that have long so held. *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Zucht v. King*, 260 U.S. 174 (1922); *Prince v. Massachusetts*, 321 U.S. 158 (1944). The majority opinion also trumpets that such compulsory vaccination laws exist in all 50 States (although it fails to observe that in 45 of those States, religious exceptions are afforded). And with this *unremarkable and uncontested observation* from above, the opinion concludes that rational basis review applies here and therefore that the "Perrys' free exercise rights do not relieve them of their obligation to comply with [West Virginia's mandatory vaccination law]." *Ante* at 9. The opinion characterizes the Perrys' claim unfairly, stating, "The Perrys cannot succeed under rational basis review simply by nibbling away at West Virginia's law one bite at a time. Children who attend school virtually may be at a lower risk of contracting

and spreading infectious diseases, but the risk still remains. . . .   West Virginia does not need to strike at all evils at the same time or in the same way." *Ante* at 20–21 (cleaned up).

The majority opinion curtly dismisses the fact that the Perrys hold sincere religious beliefs against vaccination; that their child is schooled *at home* under the virtual school program, just as are homeschooled children who need not be vaccinated under the law; and that the Supreme Court's recent decisions hold that, in circumstances as presented by the Perrys, "a court will proceed to ask whether the policy can survive strict scrutiny," so as to protect free exercise rights. *Mahmoud*, 606 U.S. at 564.  Indeed, the *Mahmoud* Court clarified that, as applicable here, "when a law imposes a burden of the same character as that in" *Wisconsin v. Yoder*, 406 U.S. 205 (1972) — that is, when a law substantially interferes with "the critical right of parents to guide the religious development of their children" — "strict scrutiny is appropriate *regardless of whether the law is neutral or generally applicable*," *id*. at 559, 565 (emphasis added), an instruction essentially ignored by the majority.

In apparent critique of this position, the majority retreats to the platitude that "[c]ourts should not rush to second-guess . . . legislative judgments." *Ante* at 21.  And employing its approach, the majority summarily defers to the West Virginia legislature, ruling simply:

> It is certainly true that West Virginia's vaccine mandate could sweep more broadly than it does. The law could apply in other contexts, to other age groups, and to other infectious diseases. But a law does not lack general applicability merely because it makes classifications. All laws do so to one degree or another.

31

*Ante* at 15.  The majority does not, however, explain how to account for the fact that the law exempts homeschooled students, students participating in learning pods, and students attending microschools.  And more importantly, the issue here is not whether we must defer to the West Virginia legislature, but whether the West Virginia legislature has deferred to the Constitution and the fundamental individual rights of the Perrys as protected by the First and Fourteenth Amendments.

Further, to avoid *Mahmoud*'s recent lesson on that topic, the majority says, again simply, "The burden imposed by West Virginia's compulsory vaccination law is not remotely 'of the same character' as those imposed in *Yoder* and *Mahmoud*." *Id*. at 19.  Yet, this conclusion was flatly contradicted by the Supreme Court when it indicated that a similar compulsory vaccination law, to which a similar religious objection was made, should be considered again in light of *Mahmoud*. *See Miller*, 146 S. Ct. 879.  Moreover, in both *Yoder* and *Mahmoud*, as well as in *Mirabelli*, the plaintiffs objected to public education regulations and practices on the basis of the burden they imposed on religious exercise, and in all, the Court applied strict scrutiny to protect the plaintiffs' free exercise rights.

III

This case focuses specifically on the rights of parents to raise their children consistent with their religious beliefs and the violation of those rights when "government policies substantially interfere with the religious development" of their children. *Mahmoud*, 606 U.S. at 546 (cleaned up).  The rights of religious upbringing "extends to

32

the choices that parents wish to make for their children outside the home," thus limiting "the government's ability to interfere with a student's religious upbringing in a public school setting." *Id*. at 547. Thus, the Supreme Court continues repeatedly to emphasize that "public education is a public benefit, and *the government cannot condition its availability on parents' willingness to accept a burden on their religious exercise*." *Id*. at 561 (emphasis added) (cleaned up). Indeed, the *Mahmoud* Court observed:

> It is both insulting and legally unsound to tell parents that they must abstain from public education in order to raise their children in their religious faiths, when alternatives can be prohibitively expensive and they already contribute to financing the public schools.

*Id.* at 562.

These circumstances are presented here. Upshur County School Officials told the Perrys that they "must abstain" from public education if the Perrys refused to fully vaccinate their child, even though the School Officials understood that doing so would violate the Perrys' sincerely held religious beliefs. The district court recognized this, and it issued a preliminary injunction enforcing this principle pending trial. Its ruling, I submit, was both factually and legally sound, and it has been fully vindicated by decisions issued by the Supreme Court since the district court ruled.

To begin, it is clear that the Upshur County School Officials' policy must satisfy strict scrutiny. It is well understood that "the government is *generally* free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Mahmoud*, 606 U.S. at 564 (emphasis added) (citing *Employment Div. v. Smith*, 494 U.S. 872, 878–79 (1990)). Thus, neutral and generally

33

applicable laws that burden religious exercise are ordinarily subject to rational basis review. But if the government policy is not generally applicable, the government must demonstrate that the policy can survive strict scrutiny. *See id*. And a law is not generally applicable if the government "treat[s] any *comparable* secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis altered). The *Tandon* Court explained that "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue" and that "[c]omparability is concerned with the risks various activities pose." *Id*.

In this case, the mandatory vaccination law is not generally applicable as it does not apply to children who receive home instruction, to children who are educated in learning pods, and to children who attend microschools. These exceptions are presumably made because the children's learning environment in those circumstances is remote and their exposure to other children is minimal, such that the purposes of the mandatory vaccination law would not be substantially served. The Perrys' child is also educated at home and thus is in a similarly remote context with a similar risk because the child's exposure to other children would be similarly minimal. Yet the state's policy treats public-school virtual students who assert a religious objection to vaccination differently than other similarly situated children. *See Tandon*, 593 U.S. at 62 (requiring the government to explain why activities posing comparable risks are treated differently). School Officials enforced their mandatory vaccination policy against the Perrys despite their religious objection, forcing

34

them to choose between a free public education and adherence to their religious beliefs, even though their child was learning remotely.  As the Perrys argue:

> West Virginia allows a variety of comparable secular activities that undermine its disease mitigation efforts to much greater degree than permitting [them] the option to pursue a religious exemption to attend online school would.  In [their child's] situation, it is clear the government has made an unconstitutional value judgment that secular motivations for opting out of vaccination are perfectly acceptable, but that religious reasons will not be tolerated — even in the virtual school setting.

Yet, as *Mahmoud* instructs, because "public education is a public benefit," "the government cannot condition its availability on parents' willingness to accept a burden on their religious exercise."  606 U.S. at 561 (cleaned up).  Indeed, in such circumstances, "strict scrutiny is appropriate *regardless of whether the law is neutral or generally applicable*."  *Id*. at 565.

Were this not clear enough, the Supreme Court's yet more recent decisions continue to emphasize the importance of *Mahmoud*.  On a petition for writ of certiorari to the Second Circuit, where that court had upheld the enforcement of a mandatory vaccination law, like the majority does here, notwithstanding the religious beliefs of the plaintiffs, *see Miller v. McDonald*, 130 F.4th 258 (2d Cir. 2025), the Supreme Court vacated the Second Circuit's judgment and remanded the case to the Second Circuit for further consideration in light of *Mahmoud*.  *See Miller*, 146 S. Ct. 879.

And again and more recently in *Mirabelli*, where parents challenged California public school gender-identity policies on free exercise grounds, the Supreme Court held — in the context of reviewing a stay of an injunction — (1) that the school policies "likely trigger strict scrutiny under [the Free Exercise Clause] because they substantially interfere with the right of parents to guide the religious development of their children," and (2) the

35

policies "will likely not survive the strict scrutiny that *Mahmoud* demands." *Mirabelli*, 146 S. Ct. at 802 (cleaned up).

While the Supreme Court has thus provided binding, repetitive, and dispositive instruction for cases of the kind before us, the majority opinion hardly addresses these decisions, rising above and finding comfort in a highly generalized distinction that the Court has expressly rejected for cases in the school context where the government has imposed a burden on religious exercise that substantially interferes with the right of parents to guide their child's religious development. *See Mahmoud*, 606 U.S. at 556, 564. Indeed, just like the circuit court in *Mirabelli*, the majority has "brushed aside *Mahmoud* as a narrow decision focused on uniquely coercive curricular requirements," *Mirabelli*, 146 S. Ct. at 802 (cleaned up), finding *Mahmoud* inapplicable on the ground that the mandatory vaccination law at issue here "is a public health measure, not an instrument of ideological indoctrination," *ante* at 19. But that cramped reading of *Mahmoud* fails to give full effect to the Court's clear instruction that when a law effectively "tell[s] parents that they must abstain from public education in order to raise their children in their religious faiths," 606 U.S. at 562, that law must survive strict scrutiny to be consistent with the space the Free Exercise Clause affords to parents "to direct the religious upbringing of their children," *id.* at 546 (cleaned up).

And when applying strict scrutiny to West Virginia's mandatory vaccination law, as applied to *virtual* students like the Perrys' child, I conclude that the law does not satisfy that standard. "To survive strict scrutiny, a government must demonstrate that its policy advances interests of the highest order and is narrowly tailored to achieve those interests."

36

*Mahmoud*, 606 U.S. at 565 (cleaned up).  Such "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest."  *Tandon*, 593 U.S. at 63.  And this standard is not to be "watered down; it really means what it says."  *Id.* at 65 (cleaned up).  Yet, the School Officials have not shown how their mandatory vaccination law is narrowly tailored in the circumstances of this case, where the Perrys seek to re-enroll their child in a *virtual* school.

To be sure, West Virginia absolutely has a compelling state interest to prevent the spread of infectious disease in order to protect the health and safety of the public, as the district court acknowledged and the majority emphasizes.  But the School Officials have failed to show that the law's failure to make an exception for virtual students with a sincere religious objection to complying with the mandatory vaccination law is consistent with narrow tailoring when students similarly situated with regard to the risk addressed need not comply at all.  The circumstances of *virtual* students are far more akin to those of children receiving education from home instruction, in learning pods, and in microschools than to those *physically* present in a school classroom.  Indeed, making an exception for the limited number of students whose parents both have a sincere religious objection to vaccinating their children and who wish to take advantage of the *virtual* school option offered by a public school system would itself be a prime example of a less restrictive alternative that would help the State advance its interests without needlessly burdening students' religious beliefs.  Thus, "The State's interest in safety could be served by a policy that allows religious exemptions" for students *learning remotely*, while enforcing the mandatory vaccination policy for students *physically attending schools*.  *Mirabelli*, 146 S. Ct. at 802.

37

Stepping back to view our action today, just as we must protect "the sanctity of public discourse" as speech that must remain free from government intrusion, *Garten Trucking LC v. NLRB*, 139 F.4th 269, 277 (4th Cir. 2025) (Wilkinson, J.), we must similarly protect the sanctity of religious exercise from government intrusion, *see EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 800–01 (4th Cir. 2000) (Wilkinson, J.) (noting that the religious ministerial exception in Title VII, which is "rooted" in the First Amendment, "promotes the most cherished principles of religious liberty" and is "robust"). Making room for religion is rightly recognized as essential to a democratic society, providing the moral underpinning necessary for true freedom. *See, e.g.*, Alexis de Tocqueville, *Democracy in America* (Henry Reeve trans., George Dearborn & Co. 1838). And this principle has special relevance in the context of parents' rights to supervise their children's religious development. Yet regretfully, the majority opinion gives this no play today.

At bottom, strict scrutiny applies to the Perrys' free exercise challenge and the Upshur County School Officials have not shown that applying the State's compulsory vaccination law to students enrolled in virtual public schools whose parents hold sincere religious beliefs against vaccinations is consistent with the kind of narrow tailoring required by the Constitution. I would accordingly affirm the district court's preliminary injunction.

38